IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 2 0 2017

CLERK, U.S. DISTRICT COURT
By_____
Deputy

FINNIS DAVIS II,                    §
                                    §
              Petitioner,           §
                                    §
v.                                  §    No. 4:16-CV-015-A
                                    §
LORIE DAVIS, Director,              §
Texas Department of Criminal        §
Justice, Correctional               §
Institutions Division,              §
                                    §
              Respondent.           §

MEMORANDUM OPINION
and
ORDER

This is a petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 filed by petitioner, Finnis Davis II, a state

prisoner incarcerated in the Correctional Institutions Division

of the Texas Department of Criminal Justice (TDCJ), against Lorie

Davis, director of TDCJ, respondent. After having considered the

pleadings, state court records, and relief sought by petitioner,

the court has concluded that the petition should be denied.

I. Procedural History

Petitioner was charged in Tarrant County, Texas, Case No.

1199412D, with attempted capital murder of Saudi Taylor and Oscar

Roney during the same criminal episode. (State Habeas R. 265,

doc. 24-42.) A jury found petition guilty and found the repeat-

offender notice in the indictment true and assessed his punishment at fifty years' imprisonment. (*Id.* at 267.) The Second District Court of Appeals of Texas affirmed the trial court's judgment, the Texas Court of Criminal Appeals refused his petition for discretionary review, and the United States Supreme Court denied his petition for writ of certiorari. (Docket Sheet 1, doc. 24-2.) Petitioner also sought postconviction state habeas-corpus relief to no avail. This federal habeas-corpus petition followed.

The state appellate court summarized the evidence in the case as follows:

> The evidence shows that appellant became possessive of Taylor, whom he knew, sending her dozens of text messages a day. Some of those messages were abusive and threatening. On May 3, 2010, Taylor had a first date with Roney. Appellant's text messages to Taylor that night indicate he knew she was out with a man and was upset about it. When the two returned to Taylor's home after the date, Taylor saw appellant sitting in his car backed into her driveway. Taylor told Roney to keep driving, and appellant began following them around the block. When they returned to Taylor's house, appellant hit the back of Roney's car with his car and began shooting at them; he then blocked off Roney's car. At that point, Taylor saw Roney slumped over the wheel with blood all over his shirt. After he blocked Roney's car, appellant got out of his car and "started shooting at [Roney's] car." Taylor testified that appellant "shot at" both of them and that he shot inside Roney's car from the driver's side. Taylor testified that appellant shot her in the thigh. Taylor got out of the car, and appellant chased

2

after her; when he caught her, he pistol-whipped her while yelling that he was going to kill her.

Roney testified that appellant "stuck a gun in [his] window" and that he heard a shot from the gun. He said he had been shot behind his left ear. Police found blood on the driver's side and what looked like bullet holes in the driver's side doorposts. Additionally, about a month before trial, Roney was washing his hair and pulled out "a little piece of fragment" about a centimeter long, but he let it go down the shower drain. One of the police officers who investigated the crime scene testified that Roney was possibly hit by a bullet that had ricocheted or fragmented from hitting the driver's side doorpost. A paramedic who had treated Roney at the scene testified that although the wound looked like it had a "penetration point" and was some kind of "entrance wound," it did not look like a gunshot wound.

Taylor and Roney both identified appellant in court as the person who "shot at" them.

(Mem. Op. 2-3, doc. 24-4.)

## II. Issues

Petitioner raises the following grounds for relief:

(1) There is no evidence to prove the "essential element of shooting two people" as charged in the indictment (ground one);

(2) The trial court erred, after defendant was first found by psychiatrists to be incompetent, by declaring him competent to stand trial and failing to conduct a competency hearing (ground two);

(3) The trial court abused its discretion by failing to sua sponte inquire into his mental capacity because his irrational behavior raised a bona fide doubt as to his competency to stand trial (ground three);

(4) the state habeas court improperly decided his ineffective-assistance-of-counsel claims (ground four);

(5) He was denied the right to effective assistance of trial counsel (grounds five through thirteen);

(6) The trial court failed to conduct an inquiry into his complaint about his trial counsel (ground fourteen); and

(7) The state engaged in prosecutorial misconduct and *Brady* violations (ground fifteen).

(Pet. 6-7 & Insert, doc. 1.)

### III. Rule 5 Statement

Respondent does not believe that the petition is time-barred or successive but does believe that petitioner has failed to exhaust one or more of his claims in state court. (Resp't's Answer 5, doc. 25.) 28 U.S.C. §§ 2244(b), (d) & 2254(b). However, a § 2254 petition may be denied on the merits notwithstanding a petitioner's failure to exhaust state-court remedies. *Id.* § 2254(b)(2).

### IV. Discussion

#### A. *Legal Standard for Granting Habeas Corpus Relief*

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state

court's adjudication of a claim resulted in a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or resulted in a decision that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington,* 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000). Further, when the Texas Court of Criminal Appeals denies a federal claim in a state habeas-corpus application without written opinion, a federal court may presume "that the state court adjudicated the claim on the merits in the

absence of any indication or state-law procedural principles to the contrary" and applied the correct "clearly established federal law, as determined by the Supreme Court of the United States," unless there is evidence that an incorrect standard was applied, in making its decision. *Johnson v. Williams,* 568 U.S. 289, 298 (2013); *Harrington,* 562 U.S. at 99; *Schaetzle v. Cockrell,* 343 F.3d 440, 444 (5th Cir. 2003).

## B. Sufficiency of the Evidence

Under his first ground, petitioner claims there was no medical or testimonial evidence proving that he shot two people because there was no evidence that he intended to kill Roney or that Roney's injury was the result of a bullet being fired at him. Petitioner relies on the paramedic's testimony that Roney's injury did not "look like a normal shooting." (Pet'r's Mem. 3, doc. 2.)

In overruling the issue on appeal, the state appellate court provided:

> Appellant contends that the evidence is insufficient to prove that Roney was actually shot; however, he does not dispute that the evidence shows he shot Taylor. The State was not required to prove that appellant was successful in his attempt to mortally wound Roney; rather, it had to prove that he intended to kill both Taylor and Roney and with that intent, committed "an act amounting to more than mere preparation that tend[ed] but fail[ed] to effect" their

6

deaths. *See* [TEX. PENAL CODE ANN.] §§ 15.01, 19.02(b)(1),
19.03(a)(7)(A); *Ex parte Milner*, 394 S.W.3d 502, 509
(Tex. Crim. App. 2013). The record contains sufficient
evidence from which the jury could reasonably conclude
that appellant shot at Roney and Taylor with the intent
to kill them both. *See Cavazos v. State*, 382 S.W.3d
377, 384 (Tex. Crim. App. 2012) ("[T]he specific intent
to kill may be inferred from the use of a deadly
weapon.").

(Mem. Op. 4, doc. 24-4.)

A claim that "no evidence" supports a conviction is the same

as a challenge to the legal sufficiency of the evidence. *Haley v.*

*Cockrell*, 306 F.3d 257, 266–67 (5th Cir. 2002), *vacated on other*

*grounds,* 541 U.S. 386 (2004); *United States v. Jackson,* 86 Fed.

App'x 722, 722 (5th Cir. 2004). Such claims are reviewed under

the legal-sufficiency standard set out in *Jackson v. Virginia,*

443 U.S. 307 (1979). Under this standard, a court views all the

evidence in the light most favorable to the prosecution in

determining whether any rational trier of fact could have found

the existence of facts necessary to establish the essential

elements of the offense beyond a reasonable doubt. *Id.* at 318-19.

In conducting a *Jackson* review, a federal habeas court may not

substitute its view of the evidence for that of the fact finder,

but must consider all of the evidence in the light most favorable

to the prosecution, with all reasonable inferences to be made in

support of the jury's verdict. *United States v. Moser,* 123 F.3d

7

813, 819 (5th Cir.1997); *Weeks v. Scott*, 55 F.3d 1059, 1061 (5th Cir.1995). Where a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993). Under state law, specific intent to kill may be inferred from the use of a gun, which is defined as a deadly weapon. *See* TEX. PENAL CODE ANN. § 107(a)(17)(A) (West Supp. 2014) Thus, applying the appropriate deference, the state court's adjudication of the claim comports with *Jackson*.

### C. Trial Court Error

Under his second and third grounds, petitioner claims the trial court erred by declaring him competent to stand trial without conducting a competency hearing and by failing to sua sponte inquire into his mental competency during trial because his irrational behavior raised a bona fide doubt as to his competency.[1] (Pet. 6-7, doc. 1.)

In overruling these issues, and relying solely on state law, the state appellate court addressed the issues as follows:

**Lack of Evidentiary Hearing**

The trial court found appellant incompetent to

---

[1]Respondent claims the first claim is procedurally barred, however because the court finds the claim is without merit the procedural-default defense is not addressed.

stand trial in September 2011 and ordered him committed to a mental health facility for no more than 120 days. On November 25, 2011, the trial court received from North Texas State Hospital a statutory notification indicating that an evaluator had determined that appellant had regained competency to stand trial. *See* Tex. Code Crim. Proc. Ann. art. 46B.079(b)(1) (West Supp. 2012). The trial court ordered the notification and attached evaluation report sealed. The record shows that the trial court sent copies of the report to appellant's counsel and the State and, on November 28, 2011, issued a bench warrant for appellant to be returned to court. *See id.* art. 46B.081. The record also contains a certificate of proceedings dated December 9, 2011 and signed by the trial judge, with the notation, "found competent."

Article 46B.084 provides that when a defendant is returned to the trial court upon a mental health facility's report that the defendant has gained competency, the trial court may determine the defendant's competency "based on the report . . . and on other medical information or personal history information relating to the defendant." *Id.* art. 46B.084(a). The statute does not require a hearing on the determination unless a party timely objects to the report. *Id.* art. 46B.084(b). The record here contains no objection to the sealed report filed with the trial court. Thus, we conclude and hold that the trial court did not err by failing to hold an evidentiary hearing to determine that appellant had become competent to stand trial. . . .

**No Sua Sponte Competency Hearing During Trial**

Appellant next argues that the trial court reversibly erred by failing to sua sponte order a competency hearing during trial based on his "irrational" and "incoherent" behavior, his prior MHMR history, his "lack of understanding of his criminal proceeding," and his "numerous absurd and [i]nsensible out[]burst[s]" during trial. Appellant points specifically to a part of the record indicating that

the trial court chastised him because he kept turning around and looking at his sister and because he appeared to be attempting to show something unidentified to the jury. He also points to his own testimony during guilt/innocence as indicating a need for the trial court to hold such a hearing.

### Applicable Facts

Before trial, appellant had the following conversation with the trial judge:

THE DEFENDANT: I understood -- I don't understand what's going on, period, because I just got a six-day notice that I was going to trial. I had no idea that I was going to trial. Yes, I've been locked up for 23 months but didn't nobody tell me that we was having a trial.

I haven't been through no procedures. I hadn't had no status conference. I hadn't been through no motion discovery. I hadn't even had no evidence exchange. And then plus this, me and my lawyer, giving me insufficient counseling, and him and the DA been working together. My lawyer been -- well, my lawyer been asking me questions about this case. He asked me questions to hurt me. So I have a feeling that him and the DA is working together. That's why I was trying to speak with you.

And they just started looking for my witnesses last month. This case been going on for two years. Yes, it have. And then -- then start looking for -- I have more than just one witness. So that's what I'm trying to say. How am I going to any chance to get a fair trial with all these odds against me?

THE COURT: Okay. Well, number one, it sounds like you have a firm grasp of what's going on

and that you've been keeping up with it very closely.

THE DEFENDANT: Right.

THE COURT: So in addition to your plea of not guilty to the count alleging that you committed the attempted capital murder, Count Two alleges that you caused bodily injury to Saudi Taylor by shooting him [sic] with a deadly weapon.

THE DEFENDANT: That's a her.

THE COURT: Okay. Her. You know more about it than I do, obviously.

THE DEFENDANT: Yes, I do.

During voir dire, appellant responded to a juror's comment that someone with a better lawyer has a better chance of being acquitted with "Exactly."

Appellant complained to the court at trial about his counsel:

THE DEFENDANT: I've been feeling that he's [trial counsel] been giving me inefficient counsel, but I don't even have an education. I didn't even graduate from high school. So, therefore, you got to kind of bear with me because y'all all got degrees. I don't. So this is going to be -- it's a lot of things I don't understand because I don't understand –

THE COURT: Okay.

THE DEFENDANT: -- the Court issues.

THE COURT: Talk to me about what your complaint is with [your trial counsel] --

> THE DEFENDANT: Oh, my complaint is that I
> feel that he's not representing me to the
> fullest. But I don't have a problem with that
> because you won't -- you wouldn't let me
> replace him. I can't do nothing if you
> wouldn't let me replace him. So I had to
> roll with what I had. Dot my I's, cross my
> T's.
>
> THE COURT: Okay. So did I not see you shake
> his hand at the end of the day yesterday and
> tell him that you thought he did a good
> job?
>
> THE DEFENDANT: I said -- yes. But he did a
> good job just one time.

Later, appellant and the trial court engaged in the
following colloquy:

> THE COURT: Well, sometimes it helps if you
> listen also. Yes, you have a right to
> testify. Is that what you want to do?
>
> THE DEFENDANT: I guess I have to. I mean,
> y'all not going to give me a mistrial so I
> can hire me a new lawyer to do this all over.
> So we have to -- I have to. I'm not going --
> I'm not going to let them hear -- let the
> jury hear they side of the story and it's
> another side. Every story have two sides.
> This case I feel that they had their side. My
> side ain't been heard. We couldn't even find
> a witness.
>
> THE COURT: All right. So the answer to my
> question about whether you want to testify is
> that, yes, you do, correct?
>
> THE DEFENDANT: I have to.
>
> THE COURT: No, you do not have to. It is your
> choice.

While appellant was testifying on his own behalf, against his counsel's advice, he wanted to address the jury directly; the trial judge had to instruct him he could not do so. Appellant was nonresponsive to his counsel's questions. The trial judge then had to call a recess to go in chambers, where defense counsel informed her that he feared appellant was about to commit perjury even though defense counsel had repeatedly warned him not to do so. In open court, before the jury returned, the trial judge warned appellant of the consequences of perjury. She then allowed appellant to testify narratively about the events of May 4, 2010, but he refused to do so. Instead, appellant kept complaining to the jury about his lawyer and telling them that they could not convict someone without a defense who had no education. Appellant kept asking them, "Please give me a hung jury." The trial judge ultimately dismissed the jury and placed appellant in a holdover cell. Before the jury returned, the trial judge talked to appellant again, warning him that she was giving him a last chance to tell the jury what happened the night of May 4, 2010. Appellant was argumentative with the trial judge when she was attempting to explain that she was giving him the opportunity to tell the jury his version of what happened that day. She allowed appellant to confer with his counsel in private.

Before the jury returned to court, appellant asked to speak to his lawyer again, telling the judge she had not given them enough time to finish. But the judge told appellant she had overheard him "cussing at" his counsel and that counsel did not "have to listen to that." When the trial judge explained to appellant that if he tried to tell the jury about anything other than what happened May 4, 2010, she would "cut [him] off," appellant told the trial court, "I'm not behaving irrational." The trial judge said, "I didn't say you were behaving irrational. You're behaving like a not very . . . [c]ooperative person." The following exchange occurred shortly thereafter:

    THE DEFENDANT: I understand. I don't

understand -- no, I take that back. I don't understand.

THE COURT: No. I feel like you understand perfectly.

THE DEFENDANT: You feel like I understand.

THE COURT: But you don't want to –

THE DEFENDANT: You feel like I understand.

THE COURT: Okay. And –

THE DEFENDANT: But I don't understand. But I'm going to do the best I can.

The trial judge then brought in the jury. When appellant again refused to address the jury about the night of the shootings, the trial court dismissed the jury. As they were leaving, appellant made the following outburst:

THE DEFENDANT: Please, please -- I still be locked up. I'm not going anywhere. If your brothers or sisters were in there, you would want them to have a good representation.

THE BAILIFF: Mr. Davis, be quiet.

THE DEFENDANT: Please don't hang me. I will still be locked up.

THE BAILIFF: Mr. Davis.

THE DEFENDANT: I will have to have another trial. Don't do me this way. I need a lawyer. I got -- I got somebody going to buy me a lawyer.

The trial judge placed appellant in a holdover cell during the charge conference and closing arguments.

During closing, appellant's counsel told the jury,

> Finally, as for Mr. Davis' conduct on the stand, I can only say to you that you can also conclude from all of that that Mr. Davis is a very frightened man. Now, that doesn't necessarily change any of the facts that lead him to the point that he's afraid of, but it is the state of mind that he is in.

### Analysis

Appellant asserts that the above outbursts show that the trial judge should have sua sponte held a hearing inquiring into appellant's competence to stand trial. We disagree.

A trial judge is required to hold a competency hearing if the evidence is sufficient to raise a bona fide doubt in the mind of the judge as to the defendant's competency. *Montoya v. State*, 291 S.W.3d 420, 424 (Tex. Crim. App. 2009). A bona fide doubt may exist if the defendant exhibits truly bizarre behavior or has a recent history of severe mental illness or at least moderate mental retardation. *Id.* at 425. The considerations when evaluating competency to stand trial include the defendant's level of understanding of the proceeding and ability to consult with counsel in preparation for the proceeding. *Id.* at 425-26. Thus, the trial judge, as one who observed the behavior of the defendant at the proceeding in question, is in a better position to determine present competency. *Id.* at 426.

The trial court here initially found appellant incompetent to stand trial and referred him to North Texas State Hospital. However, based on the hospital's report, which we have reviewed, the trial court found that appellant had gained competency. Although appellant's behavior in court was inappropriate and obstreperous, it was not "truly bizarre." In fact, from the context of the entire record, it is clear the trial

judge believed appellant understood everything that was
occurring and was merely being intentionally
argumentative and disruptive. We hold that the trial
judge did not abuse her discretion by refusing to hold
a hearing during trial inquiring into appellant's
competence. *See id.* at 426; *Moore v. State,* 999 S.W.2d
385, 395 (Tex. Crim. App. 1999), *cert. denied,* 530 U.S.
1216 (2000); *Francis v. State,* 877 S.W.2d 441, 445
(Tex. App.-Austin 1994, pet. ref'd) ("Unruly or
disruptive courtroom behavior is not in itself evidence
of incompetence.").

(Mem. Op. 4-12, doc. 24-4 (footnotes omitted).)

The Due Process Clause of the Fourteenth Amendment to the

United States Constitution requires that the trial of an accused

be conducted only when he is mentally competent. *See Cooper v.*

*Oklahoma,* 517 U.S. 348, 354 (1996); *Medina v. California,* 505

U.S. 437, 453 (1992). Therefore, the trial and conviction of a

defendant while he is mentally incompetent constitutes a denial

of the defendant's due process right to a fair trial. *See Cooper,*

517 U.S. at 354; *Medina,* 505 U.S. at 453; *Drope v. Missouri,* 420

U.S. 162, 171-72 (1975); *Pate v. Robinson,* 383 U.S. 375, 378

(1966).

To be competent to stand trial, it is not enough that the

defendant is oriented to time and place and has some recollection

of events. *See Dusky v. United States,* 362 U.S. 402, 402 (1960).

Rather, "the test must be whether he has sufficient present

ability to consult with his lawyer with a reasonable degree of

16

rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him." *Id.*; *accord Cooper,* 517 U.S. at 354; *Godinez v. Moran,* 509 U.S. 389, 396 (1993).

Further, the issue of competency may arise in two distinct contexts in a habeas-corpus proceeding. *See United States v. Williams,* 819 F.2d 605, 607-09 (5th Cir. 1987); *Enriquez v. Procunier,* 752 F.2d 111, 113-14 (5th Cir. 1984); *Johnson v. Estelle,* 704 F.2d 232, 237 (5th Cir. 1983); *Lokos,* 625 F.2d at 1261-62. First, a habeas petitioner may allege that state procedures were inadequate to ensure that he was competent to stand trial. *See id.* at 1261 (citing *Pate,* 383 U.S. at 375). Thus, a petitioner may claim that the evidence before the trial court presented a bona fide doubt as to his competency and, therefore, the court was required to hold a competency hearing before proceeding to trial. *See Williams,* 819 F.2d at 607; *Enriquez,* 752 F.2d at 113; Johnson, 704 F.2d at 238. Alternatively, a habeas petitioner may collaterally attack his conviction by showing that at the time of trial he was incompetent in fact. *See Williams*, 819 F.2d at 607; *Johnson,* 704 F.2d at 238; *Lokos,* 625 F.2d at 1261; *Zapata v. Estelle,* 588 F.2d 1017, 1020–21 (5th Cir. 1979).

The inquiry under the *Pate* procedural due process standard is whether the trial judge received information which, objectively considered, "should reasonably have raised a doubt about the defendant's competency and alerted [the court] to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Williams*, 819 F.2d at 607. Although the Supreme Court has not articulated a general standard for the nature or quantum of evidence necessary to trigger a competency hearing, it has focused on three factors that should be considered: (1) the existence of a history of irrational behavior; (2) the defendant's bearing and demeanor at the time of trial; and (3) prior medical opinions. *See Williams*, 819 F.2d at 608; *Enriquez*, 752 F.2d at 113; *Lokos*, 625 F.2d at 1261. Under the *Pate* test, to avoid a procedural due process violation, a trial court must inquire into the defendant's mental capacity *sua sponte* if the evidence raises a bona fide doubt as to his competency. *See Pate*, 383 U.S. at 385-86; *McInerney v. Puckett*, 919 F.2d 350, 351-52 (5th Cir. 1990). If a *Pate* violation is established, the federal habeas court must consider whether a meaningful hearing can be held nunc pro tunc to determine retrospectively the petitioner's competency as of the time of

trial. *See Williams,* 819 F.2d at 609; *Lokos,* 625 F.2d at 1262. If
so, the petitioner bears the burden of proving his incompetence
by a preponderance of the evidence; if not, the habeas writ must
be granted, subject to retrial at the state's discretion. *See id.*

As to the substantive inquiry, incompetency may be raised in
a post-conviction proceeding even if no competency hearing was
requested by the defendant at or before the state trial. *See
Enriquez,* 752 F.2d at 114; *Zapata,* 588 F.2d at 1021.
Nevertheless, "[t]he burden imposed upon a habeas petitioner to
demonstrate incompetency in fact at the time of trial is
extremely heavy." *Johnson,* 704 F.2d at 238. The Supreme Court has
upheld the approach, adopted under Texas law, that, at trial, the
"State may presume that the defendant is competent and require
him to shoulder the burden of proving his incompetence by a
preponderance of the evidence." *Cooper,* 116 S.Ct. at 1377;
*Medina,* 505 U.S. at 449; *Bouchillon v. Collins,* 907 F.2d 589, 592
(5th Cir. 1990). To prevail on an incompetency claim on federal
habeas review, the "petitioner must present facts sufficient 'to
positively, unequivocally and clearly generate a real,
substantial and legitimate doubt as to [his] mental capacity . .
. to meaningfully participate and cooperate with counsel. . . .'"
*Williams,* 819 F.2d at 609 (quoting *Bruce v. Estelle,* 483 F.2d

1031, 1043 (5th Cir. 1973)); *accord Enriquez,* 752 F.2d at 114; *Johnson,* 704 F.2d at 238; *Reese,* 600 F.2d at 1093.

In this case, petitioner claims both that the state trial court erred by failing to conduct a hearing on his competency to stand trial *sua sponte* and that he was, in fact, incompetent at the time of trial in April 2012. However, based on the available evidence before the trial court and deferring to the state courts' finding that petitioner was competent to stand trial, petitioner has not demonstrated that his demeanor in court and exchanges with the trial court were sufficient to raise a bona fide doubt as to his competency. Nor does petitioner demonstrate that the evidence before the trial court positively, unequivocally and clearly generated a real, substantial and legitimate doubt as to his mental competency at the time of trial. Consequently, the trial court was not obligated to hold a competency hearing and the state courts' reasonably found that petitioner was not incompetent and that he was simply acting out in the courtroom. Petitioner fails to present clear and convincing evidence to overcome the presumption of correctness afforded the trial court's finding that he was in fact competent to stand trial and during trial.

Under his fourteenth ground, petitioner claims that, in

violation of his constitutional rights, the trial court failed to conduct a personal inquiry into his complaint about his counsel. (Pet., Insert, doc. 1.) Petitioner directs the court to an exchange with the court immediately preceding voir dire where he expressed his belief that counsel was giving him "insufficient counseling," asking him questions to hurt him, and working with the DA against him. (Reporter's R., vol. 2, 41, doc. 24-7.)

The state habeas court entered the following relevant factual findings regarding this issue:

> 77. Applicant was a very argumentative and difficult client.
>
> 78. Applicant admits he complained about counsel at the start of trial.
>
> 79. Applicant presents no credible evidence that Hon. Harris should have been removed as counsel.

(State Habeas R. 235, doc. 24-42 (record citations omitted.)

Relying on its findings, and citing to *Wheat v. United States,* 486 U.S. 153 (1988), and relevant state law, the state court concluded:

> 41. The right to counsel of one's own choosing is not unqualified or absolute.
>
> 42. The right to counsel of choice "cannot be insisted upon or manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice."

43. The right to retain counsel of one's choosing "must be balanced with a trial court's need for prompt and efficient administration of justice."

44. If the request is made at the "eleventh hour," the court has the discretion to deny the request for new counsel.

45. Applicant has failed to prove that counsel should have appointed him new counsel.

(*Id.* at 241 (citations omitted).)

The state court's rejection of petitioner's claim comports with *Wheat* and Fifth Circuit case law. *See United States v. Fields,* 483 F.3d 313, 350 (5th Cir. 2007) (providing "indigent defendants have no right to appointed counsel of their choice"); *United States v. Dilworth,* 524 F.2d 470, 472 (5th Cir. 1975) (providing "the vague allegation of 'dissatisfaction' with counsel, unsupported by any specific instances of . . . inadequate representation, raised on the eve of trial . . ., strongly suggests that the motion for a continuance was merely a pretext for delay"); *United States v. Woods,* 487 F.2d 1218, 1220 (5th Cir. 1974) (providing "[a]n eleventh-hour objection by a defendant who enjoyed ample time to make his viewpoint known is, of course, an intolerable disruption of the criminal justice process").

## D. State Habeas Court Decision

Under his fourth ground, petitioner claims the state habeas court improperly decided his ineffective-assistance-of-counsel claims by relying exclusively on counsel's affidavit rather than having the required hearing. (Pet. 7, doc. 1.) Alleged defects in state habeas-corpus proceedings, including the state court's failure to hold a live evidentiary hearing, are not cognizable on federal habeas review. *See Rudd v. Johnson,* 256 F.3d 317, 320 (5th Cir. 2001); *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir. 1999). Nor does the absence of a live hearing on state habeas review render the process deficient. *See Hill v. Johnson,* 210 F.3d 481, 489-90 (5th Cir. 2000) (providing "a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying his claims"). Petitioner's reliance on case law of other circuit courts in support of his claim does not aid him as this court is bound by Fifth Circuit authority. (Pet'r's Mem. 9-11, doc.2.)

## E. Ineffective Assistance of Trial Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective

23

assistance of counsel, a petitioner must show (1) that counsel's

performance fell below an objective standard of reasonableness,

and (2) that but for counsel's deficient performance the result

of the proceeding would have been different. *Strickland*, 466 U.S.

at 688. In applying this test, a court must indulge a strong

presumption that counsel's conduct fell within the wide range of

reasonable professional assistance. *Id*. at 668, 688-89. Judicial

scrutiny of counsel's performance must be highly deferential and

every effort must be made to eliminate the distorting effects of

hindsight. *Id*. at 689.

The Supreme Court emphasized in *Harrington v. Richter* the

manner in which a federal court is to consider an ineffective-

assistance-of-counsel claim raised in a habeas petition subject

to AEDPA's strictures:

> The pivotal question is whether the state court's
> application of the *Strickland* standard was
> unreasonable. This is different from asking whether
> defense counsel's performance fell below *Strickland's*
> standard. Were that the inquiry, the analysis would be
> no different than if, for example, this Court were
> adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court.
> Under AEDPA, though, it is a necessary premise that the
> two questions are different. For purposes of §
> 2254(d)(1), "an *unreasonable* application of federal law
> is different from an *incorrect* application of federal
> law." A state court must be granted a deference and
> latitude that are not in operation when the case
> involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams,* 529 U.S. at 410)).

Accordingly, it is necessary only to determine whether the state courts' resolution of petitioner's ineffective-assistance claims was contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle,* 343 F.3d at 443.

Petitioner was represented at trial by William S. Harris, who had been licensed to practice law since 1976 and board certified in criminal law since 1988. (State Habeas R. 214, doc. 24-42.) Under grounds five through thirteen, petitioner claims counsel was ineffective by: (1) failing to investigate and develop evidence regarding Saudi Taylor's statements to police and during trial and failing to obtain expert ballistic evidence to undermine her testimony; (2) failing to raise a *Batson* objection and move to strike the jury panel and the prosecutor's peremptory challenge concerning black jurors; (3) failing to request a competency hearing; (4) failing to investigate a prior mental illness history for an insanity defense; (5) informing the trial judge that his client was about to commit perjury at trial; (6) failing to request a renewed examination of petitioner's fitness when petitioner was removed from the courtroom due to his

disruptive, belligerent, and explosive behavior; (7) failing to obtain medical records for Oscar Roney and cross-examine the paramedic who treated Roney; and (8) failing to communicate the state's original plea offer to him and allowing the offer to lapse. (Pet. Insert, doc. 1.)

Petitioner raised his ineffective-assistance claims in his state habeas application, and counsel submitted an affidavit in response, which the state court found credible and supported by the record, stating (all spelling, punctuation and/or grammatical errors are in the original):

> I was appointed by the court to represent Finnis Davis, II. I met with Mr. Davis in the Tarrant County jail on several occasions. He informed me that he had been treated by Mental Health Mental Retardation of Tarrant County. I obtained his records from MHMR, and had him evaluated by Dr. Richard Schmitt PhD. Dr. Schmitt formed the opinion that Mr. Davis was not competent to stand trial. I raised this issue with the 396th District Court and the court ordered an evaluation by Dr. William Barry Norman, PhD, who also concluded that Mr. Davis was not competent to stand trial. Both doctors cautioned that they believed he might be malingering in the symptoms that he described and presented. Nonetheless, Mr. Davis was sent to the Vernon State Hospital for treatment and observation. He was returned from that hospital after they concluded he was competent to stand trial. The court entered a finding of competency to stand trial.
>
> Mr. Davis gave several accounts of his whereabouts on the evening of the offense. Some of them were contradictory, but two of his alibi witnesses were identified and interviewed. One, in fact, did not

provide an alibi for the critical time and the other gave a statement of time that Mr. Davis was with her that was not consistent with Mr. Davis' account or that of the other alibi witness.

**Ground for Relief One:**

In his first ground for relief, Mr. Davis, charges that I was ineffective for failing to challenge Saudi Taylor's account of the number of shots fired during the attack on her and Oscar Roney. He also accused me of being ineffective for not hiring a ballistics expert to challenge the physical evidence regarding the number of sharp shots fired.

First, Mr. Davis, alleges that the evidence was that the shots were fired from the back of the car. This was not the evidence. The evidence was that the car Mr. Davis was driving pulled alongside the car being driven by Mr. Roney and shots were fired toward the side of the car. Ms. Taylor said she recalled four shots but then added that she wasn't really counting and she wasn't sure of the number. Ms. Taylor said that Mr. Davis pulled in front of them, forcing them to a stop, got out of his car approached the side of Mr. Roney's car and fired twice again.

It has been my experience that people who are being shot at frequently have a less than perfectly accurate recollection of the number of shots that were fired. However, there was nothing inconsistent in the evidence with Ms. Taylor's account. At trial the state's crime scene search officer testified that he recovered one bullet from the right front floorboard of the car and that there was a bullet hole in the doorpost behind the driver seat that he believed was created by a separate shot because of the trajectory. He also testified that both front windows and the sunroof of Mr. Roney's car were open. Thus, it was quite possible that some of the shots either missed the car entirely or passed through the open windows on both sides of the car.

Mr. Davis also complains about a failure to look for gunshot residue. Gunshot residue is detectible on the hands of people who have fired a gun for a short time after the gun is fired. The trace evidence is quickly lost either in the friction of normal use of the hands or from washing the hands. There was no evidence that either Mr. Roney or Ms. Taylor fired a gun. Additionally, any testing for gunshot residue would have necessarily had to have been done within hours after the shooting. Mr. Davis was not arrested that evening but surrendered later. The surrender occurred at a point where there would've been no need to test his hands for gunshot residue.

Mr. Davis also complains about my failure to request the appointment of a ballistics expert. I saw nothing in the offense report nor the testimony of the states witness that contradicted any of the evidence with respect to the direction from which the shots were fired and the wounds that were inflicted. Further, the firearm that was used in this case was never recovered. Thus, there was no firearm against which to test the one intact bullet that was recovered. There was no legal justification for the appointment of a ballistics expert in this case in my opinion.

**Ground for Relief Two:**

Mr. Davis also accused me of ineffective assistance for failing to make a Batson objection with respect to the seated jury. It has been several years since I tried this case and I do not specifically remember how many minority jurors may have been stricken by the state peremptorily. However, I am very familiar with the doctrine that was first enunciated in *Batson vs. Kentucky*. I have made such objections following the seating of a jury many times in criminal trials. I do not make such objections frivolously. I only make such an objection if I can identify minority jurors are who have been stricken by the state with a peremptory challenge, and there is no apparent race neutral justification for striking the venire person. The fact that I made no such objection is this case

suggests to me that either no such strikes were made by the state or, more likely, I could readily identify a race neutral reason for the state striking the juror.

**Ground for Relief Three:**

Mr. Davis's charges that I was ineffective for failing to request a competency hearing after his return from Vernon State Hospital. The record reflects that the court entered a finding that he was competent on December 9, 2011. As mentioned previously, both Drs. Schmitt and Norman suspected that Mr. Davis was malingering. The report from the psychologist at Vernon State Hospital supported that conclusion. Mr. Davis made a sudden and almost miraculous recovery after he arrived at the hospital. Further, the report from Vernon State Hospital reflected that none of their trained staff observed conduct by Mr. Davis that was consistent with the symptoms he was claiming. There was no basis, in light of all of this evidence, to ask for a hearing to contest the issue of Mr. Davis's competency.

Further, in my interactions with Mr. Davis following his return he demonstrated knowledge of the charges against him and suggested numerous strategies for disproving his guilt. There simply was nothing to suggest after his return that he was not competent to stand trial. For that reason I did not challenge the court's finding of competency.

The doctor at Vernon State Hospital observed in her report that Mr. Davis was argumentative and demanding and that he would be a difficult client. That observation is totally consistent with my experience in trying to represent Mr. Davis. Nevertheless, from that point forward I did not see anything that would cause me to believe that the competency determination was inaccurate or that the report from Vernon State Hospital was incorrect. Therefore I did not ask for any further determination of his competency to stand trial.

**Ground for Relief Five:**

Mr. Davis charges me with ineffective assistance for failure to investigate a threatening letter that he said he received while in jail. The letter appears to threaten retaliation against him for his attack on Saudi Taylor, but is unsigned. At my direction, my investigator, Wes Bearden, who also was cocounsel in this case, attempted to interview Ms. Taylor. When the investigator identified himself as a private investigator working for Mr. Davis she said, "no comment" and slammed the door in his face. I did not believe that a gamble that Ms. Taylor might have written the letter or had it written was strategically wise since I did not know her answer.

Moreover, it was my investigator's opinion that the handwriting on the letter was consistent with Mr. Davis's handwriting. I have no opinion on that, but I believed that the letter in tone appears to have been written by a third-party seeking to protect Ms. Taylor. Mr. Roney was an obvious candidate for that role. He denied writing the letter.

Even if Ms. Taylor had directed the writing of the letter, in light of what happened to her I did not think that drawing out the fact that she had written this letter or solicited its writing would benefit Mr. Davis. Having been shot in the leg and had her face pounded into the concrete several times breaking a tooth seemed to me to be logically likely to cause a person to threaten revenge if the legal system did not deliver justice. In my opinion, the letter, while it may have reflected animus toward the defendant, had no relevance to show that he was not the person who had committed the crime. Her dislike for the Mr. Davis and what he did to her was already amply apparent in her testimony.

**Ground for Relief Six:**

Mr. Davis accuses me of being ineffective for failing to investigate his prior mental history and

raise an insanity defense. First, I did investigate his prior mental history, I obtained and read his mental health mental retardation records and provided them to Dr. Schmitt for his initial evaluation. They were part of Dr. Schmitt's basis, despite his concerns about malingering, for finding the defendant incompetent to stand trial.

Second, the evaluations done of Mr. Davis at Vernon State Hospital, in my opinion, confirmed that he was malingering and faking his symptoms. That certainly was consistent with the type of manipulative client he was throughout my representation of him. During our conversations after his return from Vernon State Hospital he gave no indication that he did not understand that shooting somebody was wrong. Moreover, he consistently denied having been the person who shot Mr. Roney and Ms. Taylor.

The insanity defense is what is characterized as an admission and avoidance defense. It requires that the person seeking to assert the defense first admit that he committed the act that constitutes the crime. Prior to trial Mr. Davis consistently insisted that he was not guilty of the crime. The combination of these factors gave no basis for giving notice of an insanity defense at trial. I did consider that defense. I rejected the defense because after investigation I saw no basis for its assertion. I still do not.

**Ground for Relief Seven:**

Mr. Davis charges I was ineffective for having disclosed that he appeared to be trying to commit perjury in his testimony.

Shortly after the trial started, in a conference in the holding area behind the court room, Mr. Davis told Mr. Bearden and me for the first time that he had committed the offense. My recollection is that he wanted to see if a plea-bargain could be obtained at this late date. The state was uninterested at this point in any plea bargaining. Nevertheless, I found the

31

admission extremely significant, because it was the only statement about his culpability that Mr. Davis made, that was consistent with the overwhelming evidence in the case. At the time he made the statement he had also informed me that he did not wish to testify at his trial.

During the trial, Mr. Davis was disruptive and difficult. He was cautioned several times by the judge that his misbehavior might result in his being excluded from the courtroom. On at least one occasion he yelled at the witness, Saudi Taylor, that she lied.

After the state rested its case Mr. Bearden and I met with Mr. Davis again in the holding cell behind the courtroom. At that time Mr. Davis informed me that he was going to testify. I strongly advised him not to, but he insisted that he was going to testify. I then informed him that because he had told me that he had committed the offense, if he took the stand and began to say that he was not there or did not commit the offense or anything to that effect I would be ethically required to stop the proceeding and inform the judge in camera that he was about to commit perjury.

Mr. Davis took the stand and I began to lead him through direct examination. He demonstrated a determination to address the jury independent of the questions I asked him. After several admonitions by the court, he turned to the jury and said that he had been locked up for 23 months for something he did not do. This was not a responsive answer to my question, but it clearly indicated that he was going to tell the jury that he had not committed the crime. I asked the court to excuse the jury and allow me to address an issue with her *ex parte* in chambers on the record. That motion was granted.

In chambers I informed the judge that, based on his statement that he had been locked up for something he did not do, I believed he was contemplating committing perjury. I informed her that I had discussed this with him and tried to dissuade him from doing it.

I had told him this in Mr. Bearden's presence and we had both tried to dissuade him from that course. When I told him that I believed a statement that he did not do it would be perjury he asked why believed that. I told him I believed it because he had admitted committing the offense to me at the beginning of the trial. His response was to point out that he had told me several different stories regarding his participation or lack of participation in this crime and asked me why believed the story that he did it. I replied that it was the first account he had given me that was consistent with all of the rest of the evidence. I explained that if he tried to commit perjury I would have to inform the court and ask to withdraw. At this point he began to curse me and I terminated the conversation.

The judge ordered me to ask him no questions beyond asking him to tell the jury what he wanted to say. She explained this process to Mr. Davis outside the presence of the jury. The jury was brought back into the courtroom I asked Mr. Davis to tell the jury what he wanted them to know about his participation in the crime. Mr. Davis began a contentious dispute with the judge and a diatribe against me accusing me of having abandoned him and left him without counsel during trial. In accordance with the judge's instructions I did not respond.

Ultimately, the judge could not get Mr. Davis to directly address the crime and after several admonishments and outbursts from Mr. Davis she excluded him from the courtroom. During the remainder of the trial on guilt Mr. Davis could be heard screaming from the holdover that he was being railroaded and begging the jury to deliver a "hung jury". The jury found him guilty.

During the punishment phase, the judge allowed Mr. Davis to return to the courtroom wearing a stun belt to guarantee his good behavior.

**Ground for Relief Eight:**

Mr. Davis also accuses me of ineffectiveness for failing to request a new competency examination when he became disruptive in the courtroom. First, I note that none of the three psychologists who examined Mr. Davis concluded that he was in fact suffering from schizophrenia.

Second, nothing in his conduct at trial indicated to me that he was acting out because he was inspired by delusions, hallucinations, voices ordering him to do so or anything else that suggested that his actions were caused by mental illness as opposed to his argumentative and manipulative personality. In my professional judgment, I simply saw no evidence that he was not competent to stand trial. What I saw was a continuation of his manipulative and argumentative behavior. I do not believe the court saw it differently. In fact, in light of the fact that the court has a duty to spontaneously order such an examination if she independently comes to believe that a defendant has become incompetent during the trial, and did not do so, suggests that she also did not believe Mr. Davis' conduct suggested incompetency.

**Ground for Relief Nine:**

Mr. Davis accuses me of ineffective assistance for not requesting the medical records of Oscar Roney. While it has been several years since I tried this case, I believe I did have the medical records on Mr. Roney through discovery from the state. Further, the testimony by the crime scene officer and the weapons examiner both suggested that the bullet that had struck Mr. Roney in the back of the head had first hit the door pillar behind his seat. The testimony of the crime scene officer was that that was a separate shot from the bullet he recovered and that bullet probably fragmented. This would have been consistent with the description of the wound that Mr. Davis complains about.

After the trial, I returned to the district attorney the documents that I had received during discovery. At the time of my representation of Mr. Davis, article 39.14 of the Texas code of criminal procedure had not yet been amended pursuant to the "Michael Morton Act." The District Attorney of Tarrant County provided discovery through an agreement that I and other members of the defense bar in Tarrant County entered into. In that contract the items received in discovery were to be considered property of the district attorney to be held in trust by the defense attorney for use during trial. The constraints of that agreement were very similar to the constraints placed on a defense attorney's use of discovery now under the amended law. At the conclusion of the case I returned the discovery to the district attorney. While I do not now remember whether Mr. Roney's medical records were included in the discovery, I do not see any inconsistency between the paramedics description of the wound and the explanation that the bullet fragmented upon hitting the doorpost and then traveled into Mr. Roney's head. That is consistent with the photographs I saw, the testimony of the persons at the scene of the crime and the testimony of the victims. Mr. Roney, who had originally declined to identify the defendant as his attacker, explained during trial that he had done so because he was contemplating taking vengeance upon the defendant himself. He explained that ultimately he decided this was wrong. He also explained in his testimony that he knew the defendant and that the defendant was his assailant on the night of the attack.

**Ground for Relief Eleven:**

Mr. Davis accused me of rendering ineffective assistance of counsel by not explaining to him the ramifications of a plea offer. Mr. Davis was consistently argumentative any time I tried to explain anything that he did not agree with. I recall that on numerous occasions I attempted to discuss with him the possibility of plea negotiation and that if we proceeded to trial he faced a penalty range of up to life in prison. Mr. Davis consistently argued that he

was not guilty of this offense and interrupted any such explanation until shortly after trial began. He was not receptive to the discussion of plea bargaining nor was he willing to listen to explanations of the strategic reasons for plea bargaining in his case. When a client insists to me that he is innocent and will not plead guilty, I do not think I can ethically try to persuade him to accept a plea even if the evidence against him is overwhelming. That is not my practice and it was not my practice in this case. I do not at this time specifically recall a plea offer of 20 years being made, but I do distinctly recall that any discussions of plea bargaining quickly devolved into argument. I think Mr. Davis did want to plea negotiate after the trial began when he told me that he was guilty of the offense, but my recollection is that the state was not interested in plea negotiation at that point.

I may well have advised Mr. Davis not to accept a 20 year plea offer during the initial stages of my representation of him. At that time, he was telling me that he had not committed the offense. I also had not had adequate time to complete discovery or investigate the case. I did on several occasions attempt to discuss with Mr. Davis the evidence against him. As previously stated, this usually devolved into argument and denial by Mr. Davis of his participation in the offense. I did not bring him to a discovery hearing because, as mentioned earlier, discovery in Tarrant County was provided by agreement without need for hearing on a motion for discovery.

While, as stated, I do not specifically recall a twenty-year offer, I do not dispute that one may have been made very early in the case. I do note, that I found in Mr. Bearden's files a consultation docket form in which the state informed Mr. Davis that the penalty range for aggravated assault with a deadly weapon was 2 to 20 years. It also stated that at that time no plea offer was being made.

Finally, in passing, I did not address ground for relief number four because it complained of a failure

of action by the trial court. However, in the ground
for relief Mr. Davis accuses me of having threatened to
testify against him. I never made any such threat. I
never testified against Mr. Davis. I simply followed,
as I told him I would, the procedure I understand to be
necessary when an attorney has cause to believe his
client is about to commit perjury. Following Mr.
Davis's attempt to commit perjury I was ordered by the
court not to participate in his questioning before the
jury. I obeyed the order of the court.

(State Habeas R. 214-26, doc. 24-42.)

The state habeas court adopted factual findings consistent

with counsel's affidavit, too numerous to list here, and,

applying the *Strickland* standard, concluded that counsel's acts

and omissions were the result of reasonable trial strategy or

that there was no evidentiary basis to support the claims; that

petitioner failed to prove counsel's representation fell below an

objective standard of reasonableness; and that petitioner failed

to demonstrate a reasonable probability that the outcome of his

trial would have been different had counsel done anything

differently. (*Id.* at 237-40.) Petitioner has not presented clear

and convincing evidence refuting the presumption of correctness

of the state court's findings; thus, the court has relied upon

the presumptive correctness of those findings in considering

petitioner's claims. Applying the appropriate deference, and

having independently reviewed petitioner's claims in conjunction

with the state court records, the state courts' adjudication of the claims is not contrary to or an unreasonable application of *Strickland*. A petitioner shoulders a heavy burden to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner presents no evidentiary, factual, or legal basis in this federal habeas action that could lead the court to conclude that the state courts unreasonably applied the standards set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). Strategic decisions by counsel after adequate investigation are virtually unchallengeable and generally do not provide a basis for habeas-corpus relief. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009). Nor are petitioner's conclusory allegations of ineffective assistance sufficient to raise a constitutional issue. *See Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983). Additionally, the evidence of petitioner's guilt was overwhelming, precluding him from establishing prejudice. *See Pondexter v. Quarterman*, 537 F.3d 511, 524 (5th Cir. 2008).

### F. Prosecutorial Misconduct

Under his final ground, petitioner claims he was denied due

process due to prosecutorial misconduct and *Brady* violations.

(Pet. Insert, doc. 1.) In support, he provides the following

facts:

> The district attorney stated at pre-trial held on April
> 9, 2012, that there was only one bullet found at the
> crime scene. At trial commencing on April 10, 2012, in
> the presence of the jury the attorney for the State
> allowed witness Saudi Taylor, to commit perjury as to
> the number of shots fired at Mr. Roney's ear while they
> were inside of his vehicle. The attorney for the State
> withheld Mr. Roney's medical records from the record
> and the Jury. There was no physician's expert testimony
> in the petitioner's trial.

(*Id.*)

The state habeas court entered the following factual

findings on these claims:

> 84. Applicant presents evidence of inconsistent
> testimony.
>
> . . .
>
> 87. Applicant presents no evidence that Ms. Taylor
> testified falsely.
>
> 88. Applicant presents no evidence that the State
> suborned perjury.
>
> 89. Applicant presents no evidence that the State
> failed to disclose Mr. Roney's medical records.

(State Habeas R. 236, doc. 24-42 (citations to the record

omitted.)

Based on its findings, and citing to *United States v. Bagley*

and relevant state law, the state court entered the following legal conclusions:

> 47. The State may not obtain a conviction through the use of perjured testimony.
>
> 48. Knowingly using perjured testimony amounts to prosecutorial misconduct.
>
> 49. Unknowing use of perjury is considered a due process violation.
>
> 50. Inconsistent testimony goes to the credibility of the State's witnesses and does not establish the use of perjured testimony.
>
> 51. Applicant has failed to prove that Ms. Taylor testified falsely.
>
> 52. Applicant has failed to prove that the State presented false testimony.
>
> 53. A due process claim of failure to disclose exculpatory evidence requires a showing that the state failed to disclose evidence, regardless of the prosecution's good or bad faith, the withheld evidence is favorable to the defendant, and the evidence is material, meaning that there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed.
>
> 54. Applicant has failed to prove that the State failed to disclose evidence.

(*Id.* at 241-42 (citations omitted).)

Petitioner has not demonstrated that the state court's adjudication of the first issue was contrary to, or involved an unreasonable application of, clearly established Supreme Court

precedent, and the state court's decision comports with Fifth
Circuit case law. *See Kirkpatrick v. Whitley*, 992 F.2d 491, 497
(5th Cir. 1993). *See also Little v. Butler*, 848 F.2d 73, 76 (5th
Cir. 1988) (inconsistencies in witnesses' testimony at trial are
to be resolved by trier of fact and do not suffice to establish
that certain testimony was perjured). Petitioner has failed to
show that Taylor's testimony was actually false, that the
prosecution knew her testimony was false and failed to correct
it, or that her testimony regarding the number of shots fired was
material given other evidence that more than one shot was fired.

Nor has petitioner demonstrated that the state court's
adjudication of the *Brady* issue was contrary to, or involved an
unreasonable application of, clearly established Supreme Court
precedent. Under *Brady v. Maryland,* 373 U.S. 83 (1963), the state
has an affirmative duty to disclose evidence favorable and
material to a defendant's guilt or punishment. Petitioner fails
to show that the state was in possession of Roney's medical
records and suppressed or withheld them or that the records would
have been favorable to him.

For the reasons discussed herein,

The court ORDERS that petitioner's petition for a writ of
habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby,

41

denied. The court further ORDERS that a certificate of
appealability be, and is hereby, denied, as petitioner has not
made a substantial showing of the denial of a constitutional
right.

SIGNED October _20_, 2017.


JOHN McBRYDE
UNITED STATES DISTRICT JUDGE